## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LISA MUSE,**

               Plaintiff,

               v.

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,**

               Defendant.

Case No. 1:23-cv-00407 (TNM)

## <u>MEMORANDUM OPINION</u>

Plaintiff Lisa Muse brought this action under Title VII against her former employer, the Washington Metropolitan Area Transit Authority (WMATA). She alleges that her old supervisor discriminated against her on the basis of sex and retaliated against her for reporting him. More, he subjected her to a hostile employment environment.

The parties finished discovery, and WMATA now moves for summary judgment. The Court will grant that motion. Muse has failed to raise a genuine issue of material fact for any of her allegations. The evidence she cites to show WMATA's explanations are pretextual cannot bear the weight she wants it to. And she has offered no proof that her workplace was pervasively discriminatory or intolerable. Instead, the record leads to one reasonable conclusion: Muse was repeatedly admonished and ultimately terminated because of many instances of misconduct and unprofessionalism. For that, Title VII provides no remedy.

## I.

After sixteen good years working for WMATA, Lisa Muse started to hit some road bumps. She was having issues with her direct supervisor, Keith Sanders. Muse Depo., ECF No. 17-15, 28:13–15; 54:13–6. He had been her immediate supervisor for roughly a year, and the

two had seen their fair share of spats.  Muse Depo. 26:18–21.  So she reached out to an
administrator in the General Manager's Office, Kevin Coyne.  Muse Depo. 74:1–8.  She had
received the tip to contact Coyne from a colleague who had previously filed a complaint against
Sanders.  Muse Depo. 73:13–22; Determination Ltr., ECF No. 17-16, at 1.  Ultimately, the
discussions between Muse and Coyne were kept private; Coyne did not refer her complaint to
WMATA's Office of Equal Employment Opportunity (OEEO).  Muse Depo. 74: 9–13.

But tensions between Muse and Sanders simmered.  So Muse contacted Carla Elliot, the
manager of the WMATA's OEEO office, on October 28, 2021.  Jewel Bell Depo., ECF No. 19-
3, 36:15–18.  They discussed Muse's dissatisfaction with Sanders' leadership.  But Muse admits
that she did not tell Elliot that Sanders was treating her differently because she was a woman.
Muse Depo., 88:8–11.  Instead, she "indicated that [she felt] that Keith Sanders, Service
Director, ha[d] singled [her] out and targeted [her] through accusatory emails and engag[ed]
[her] subordinate Assistant Superintendents instead of [her]."  Ex. 3, ECF 17-4.  A follow-up
email from Elliot to Muse confirms what they discussed in their conversation.  Elliot recapped:
"When asked if it was your perception that the negative treatment was because of or motivated
by any protected category, you indicated it was not your perception."  Ex. 3.  Elliot accordingly
directed the complaint to employee relations, finding it was more in their wheelhouse.  Ex. 3.  So
Muse filed a complaint with the employee relations office a couple of days later, on November 1.
Muse Depo. 52:4–20.  The complaint was not pursued.  Discrimination Charge, ECF 17-2.

Meanwhile, the relationship between Muse and Sanders soured further.  On November
10, Sanders issued Muse a written warning ("Written Warning").  Written Warning, ECF No. 17-
6.  The purpose of this was to "document [Muse's] performance issues since July 2021."  Written
Warning at 1.  Sanders listed his "areas of concerns in [Muse's] overall management of the

Montgomery (MOTR) Bus Transportation Division." Written Warning at 1. He grouped these areas of concern under five broad headings: "Sense of Urgency/Accountability"; "Teamwork"; "Integrity"; "Respect"; and "Commitment." Written Warning at 1–4.

For "Sense of Urgency/Accountability," Sanders noted that Muse agreed to finish a spreadsheet by a specific deadline but failed to do so. Written Warning at 1. Sanders thus completed a portion of the spreadsheet himself and gave Muse an extension. Written Warning at 1. But still, Muse did not complete the assignment in time. Written Warning at 1. So Sanders finished it, employing some of Muse's subordinates to help. Written Warning at 1. The next week, Muse approved vacation leave for both of her assistants although she would be in training during that time. Written Warning at 1. Muse lacked "an effective plan to manage the division" during her absence. Written Warning at 1.

Sanders then highlighted Muse's failure to investigate a major bus accident. Written Warning at 1. He noted she failed to report to the scene, as she was out of the area that day. Written Warning at 1. And she did not produce accurate data to aid the later investigation of the accident. Written Warning at 2. More, amid the investigation, Muse "request[ed] an unscheduled/unplanned vacation leave . . . due to a family emergency," although she told another employee it was "because of stress." Written Warning at 2. Sanders claimed Muse "neglected to brief [her] staff on pertinent matters in [her] absence" and "failed to enter leave even after [she was] directed to do so." Written Warning at 2.

Sanders then described her deficiencies in the "Teamwork" and "Integrity" categories. Written Warning at 2. She failed to brief her proxy for the accident investigation during her unscheduled leave. Written Warning at 3. And she neglected to comply with an audit. Written

Warning at 3.  He also discussed three different unplanned absences that occurred over about two months.  Written Warning at 3.

Under the "Respect" heading, Sanders alerted Muse to some of Muse's direct subordinates' concerns.  Written Warning at 3.  He wrote that her staff "does not feel adequately briefed on high-level nor routine activities"; that they do not believe they should "escalate concerns" to Muse as she "may not have the answer"; that they "do[] not feel properly trained on the activities to which [she] assign[s] them"; and that Muse "fail[s] to share in the workload assigned to [her] staff."  Written Warning at 3.

Finally, Sanders listed some clear expectations moving forward under the "Commitment" category.  Written Warning at 4.  He wanted to see that Muse could "delegate and organize to ensure tasks are completed timely"; that her staff was "briefed and underst[ood] expectations in [her] absence"; and that she "improve[d] the tracking and communication of high-level incidents."  Written Warning at 4.  He also noted that she needed to comply with the proper process for requesting sick leave in the future.  Written Warning at 4.  He concluded by saying that he was "committed to providing [her] support to be successful in [her] current role." Written Warning at 4.

Muse recounts this Written Warning differently.  She characterizes the warning as "admonish[ing] Plaintiff for failing to timely [submit] a spreadsheet."  Pl.'s Mem. Opp'n, ECF No. 19, at 9.  And she claims it "unreasonably admonished [her] for being out of town while off duty when an unexpected accident happened."  *Id*.  She asserts that her reason for failing to submit the spreadsheet on time was because she was short staffed.  Muse Depo., 97:3–6.  But she admits that she should have gone to the bus accident.  Muse Depo., 107: 11–13.

After the Written Warning, things would only go downhill.  Two weeks later, Muse was suspended for five days without pay.  Ltr. of Suspension, ECF No. 17-7.  Sanders detailed the reasons for the suspension in a memorandum that "conclude[d] an investigation into compliance with COVID-19 Compliance procedures and the truthfulness of statements made by [Muse] into those matters."  Ltr. of Suspension at 1.  The memo found that one of Muse's subordinates was noncompliant with vaccination requirements.  Ltr. of Suspension at 1.  When the subordinate came to work without his vaccination card, Muse "deviated from the procedure by granting [the operator] vacation leave."  Ltr. of Suspension at 1.  A representative from WMATA's labor department asked Muse about the operator's compliance and presence at work.  Ltr. of Suspension at 1–2.  Muse responded that the operator was not at work but failed to notify the representative that she had given the operator vacation leave.  Ltr. of Suspension at 2.  The representative therefore presumed that the operator was scheduled off, although he had not been.  Ltr. of Suspension at 2.

The next day, Muse "deviated from the procedure again when [she] permitted [the operator] to return to work without uploading his alleged vaccination card denoting that he was fully vaccinated."  Ltr. of Suspension at 2.  When asked whether the operator had complied with the vaccination requirements, Muse informed the Vice President of WMATA that he was fully vaccinated and provided a card to prove it.  Ltr. of Suspension at 2.  But this statement was later found to be untruthful, as Muse "had not verified that he had uploaded his vaccination card."  Ltr. of Suspension at 2.  Further, Sanders noted that Muse's division had "conflated and inflated" certain data.  Ltr. of Suspension at 3.  He concluded that Muse's data "tends to be inaccurate and the integrity of the data to be compromised."  Ltr. of Suspension at 3.

Muse describes the reason she was suspended a bit differently. She recounts that Sanders suspended her "because [she] gave one of [her] bus operators leave to go home to get his COVID vaccine card and to bring it back to the division." Muse Depo., 114:1–3. And she insists that she verified the operator's vaccination status before letting him clock back in. Muse Depo. 123:17–22.

Muse served her suspension then returned to work. Things would stay quiet for about a month, when Muse received a Coaching Memorandum from Sanders. Muse Depo., 124:14–18. This was a "non-disciplinary recap and closure" for the events surrounding the termination of one of Muse's subordinate bus operators. Coaching Memo., ECF No. 17-8, at 2. Muse had terminated the operator, but management later rescinded the termination. Muse Depo. 126:1–22. The Coaching Memorandum discussed the procedures that a supervisor must take before issuing a letter of termination to a subordinate. Coaching Memo. at 2–3. Sanders expressed his "hope that [Muse] receive[d] the documented coaching event in the spirit in which it was presented which [was] to share with [her] some things that [they] could have done correctly and better." Coaching Memo. at 3. Muse complains that she was instructed to terminate the employee and was never told why the termination was revoked. Muse Depo. 126:1–22. She claims that the incident made her look "incompetent." Muse Depo. 127:1.

The new year passed without incident. Then, on February 8, Muse received her Performance Evaluation from Sanders. Performance Eval., ECF No. 17-9. The evaluation scored Muse on three WMATA priorities: "Safety," "Customer Service," and "Personal Leadership." Performance Eval. at 1–3. For "Safety," Sanders rated Muse "Below Target." Performance Eval. at 1. He noted that her unit missed target numbers for reported injuries and preventable collisions. Performance Eval. at 1–2. And he reported that Muse's investigation of

the bus accident "required extensive oversight" by senior and executive leadership that "could have exposed the agency to further liabilities."  Performance Eval. at 2.  Sanders found Muse "On Target" for "Customer Service," but he emphasized that she had outstanding "Grievances" that had not been addressed.  Performance Eval. at 2.  For "Personal Leadership," Sanders rated Muse "Below Target."  Performance Eval. at 3.  He listed assignments that Muse failed to complete, including training classes.  Performance Eval. at 3.  And he noted that her subordinates lacked the tools they needed to accomplish their tasks.  Performance Eval. at 3.  He also cited the suspension "for untruthful statements" about her operator's vaccination status.  Performance Eval. at 3.  The evaluation had a spot for attachments, where Sanders uploaded the Coaching Memorandum, the Written Warning, and the Letter of Suspension.  Performance Eval. at 3.

Muse believes that "Director Sanders gave [her] a below target performance evaluation as a result of the Coaching Memorandum."  Pl.'s Opp. Mem. at 11.  She points out that "[p]rior to November 1, prior to [her] filing a complaint, [she] never had any performance issues."  Muse Depo. 159:11–14.

Three days after the performance evaluation, Muse went on an extended leave of absence.  Muse Depo., 145:10–11.  She was having "chest pains" and "really bad anxiety and stress."  Muse Depo., 145:15–17.  She was put in outpatient treatment for anxiety and depression and approved for leave through April.  Muse Depo., 147:6–10; Leave Docs., ECF No. 17-17.

While Muse was on leave, an investigation wrapped up about a couple of incidents that happened under her supervision.  The results of that investigation were sent from Jan Bryant, the Director of WMATA's OEEO, to Vice President Jones.  Investigation, ECF No. 17-10.  The summary memorandum documented two incidents involving one of Muse's subordinates.  First was a conflict during which a female bus operator threatened a male supervisor that she would

falsely report that he had forced her to fellate him, raped her, and robbed her. Investigation at 1. Muse was provided with six contemporaneous written statements of the incident. Investigation at 1. But "Muse did not report this incident to OEEO until instructed to do so," months later. Investigation at 2. And when she did report the incident, she failed to cite the female operator for violating the sexual harassment policy. Investigation at 2.

The second incident that the investigation uncovered involved the same female operator. Investigation at 1. A male bus operator had reported to Muse that the female driver had been spreading rumors around the division "that he was gay and that she had a video of him engaging in various sex acts." Investigation at 1. The two operators had previously had sex, a couple years before. Investigation at 2. The male operator met with Muse to report the rumors. Investigation at 3. During that meeting, Muse shared with the male operator that the female operator "is promiscuous and engages in sexual activity with numerous Metro employees [and] has a video camera and a pole in her bedroom." Investigation at 3. Though Muse asked the male operator to file a complaint with OEEO, he refused. Investigation at 3. Muse later "contended she did not need to [report the situation] if the reporting employee did not want to file a complaint." Investigation at 3. So she took no action on the male operator's information.

OEEO concluded that Muse violated company policy. Investigation at 5–6. It emphasized that she "neglected to forward the incident reported to her to OEEO for handling and resolution," and that the failure "appear[ed] to be intentional, insofar as L. Muse knew or should have known of her obligation as a member of management to forward reports to OEEO." Investigation at 5. The violation "creates liability for Metro as it negates the affirmative defense to claims of sexual harassment." Investigation at 5. OEEO found that, "[i]n addition to failing to fulfill policy obligations, L. Muse appears to be challenged in making good supervisory

judgments." Investigation at 5. Of particular concern was "the level of association and involvement with subordinate employees L. Muse has," specifically that she "provided very specific and personal information about [the female operator's] lifestyle (promiscuity) and the presence of a camera and pole in [her] bedroom." Investigation at 5. OEEO emphasized that "[a]nyone in management aware that a subordinate employee was engaging in sexual liaisons with multiple individuals should have counseled that employee on the potential for sexual harassment." Investigation at 5. To OEEO, it was "questionable whether L. Muse [could] effectively manage given the identified lapses in judgment which have a negative impact on Metro as an employer." Investigation at 5. In conclusion, OEEO recommended that Muse be demoted so her actions and performance could be "closely monitored." Investigation at 6.

On March 2, Muse was terminated. Termination Ltr., ECF No. 17-12. WMATA cited "persistent performance concerns," as well as a lack of "integrity and accountability as a manger in Bus transportations" as justifications. It also pointed to the Written Warning, the suspension, and the Performance Review. Discharge Review, ECF No. 17-11. WMATA stressed that there were "repeated instances" where Muse ignored COVID-19 policies "because she believed as she indicated that at 'her level' she could make such deviations." Discharge Review at 1. Although she was issued correctives, "she chose to ignore th[o]se directives and re-instructions allowing various Bus Operators to work when they should have been held off due to COVID-19 protocols." Discharge Review at 1. And in the case of the operator who prompted Muse's suspension, "[w]hen questioned about the employee's availability status, Ms. Muse lied and said the person was on scheduled leave." Discharge Review at 1.

WMATA also discussed the "several occasions where assignments [were] not completed timely such as accident investigations . . . incomplete bus operator performance conversations,

unplanned absences that seem to pop up when there is a concern with a task, and not briefing her

staff in her absence." Discharge Review at 1. To WMATA, Muse's "consistent lack of urgency,

accountability, integrity, and commitment is concerning in the arena of managing daily bus

operations." Discharge Review at 1.

WMATA also discussed that "Muse was aware of a situation where an employee

confided in her regarding fear due to threats of a sexual nature by another employee," but Muse

"did not report this information to OEEO." Discharge Review at 2. Though "she was aware of

her responsibility to report," she did not. Discharge Review at 2. She "was also aware that an

operator . . . was involved with and threatened by [the same employee] and did not address this

either to ensure the practice ended." Discharge Review at 2. While OEEO recommended

demotion as a result of those incidents, OEEO did not address Muse's "persistent performance

concerns." Discharge Review at 2. Altogether, WMATA thought "that Ms. Muse [was] not

capable of managing others, and repeatedly fails to enforce policies." Discharge Review at 2.

Also, WMATA found she was unwilling "to perform her job as a manager with integrity."

Discharge Review at 2. So "Employee Relations concur[red] with the recommendation that Ms.

Muse . . . be terminated," as did immediate and senior management. Discharge Review at 2.

The next month, Muse filed a formal claim with the Equal Employment Opportunity

Commission (EEOC). Charge of Discrimination, ECF No. 17-2. She disclosed that she had

contacted WMATA's employee relations office on November 1 and "lodged a complaint against

Mr. Sanders identifying his discriminatory and unfair treatment." Charge at 1. She described

how she had "complained that Mr. Sanders was denying her the tools, help and assistance that

she needed to perform her duties" while "provid[ing] assistance to the male Superintendents."

Charge at 1. She reported that she had "also complained that Mr. Sa[]nders was bullying her as a

female and otherwise creating a hostile work environment." Charge at 1. She listed the various disciplinary actions Sanders then took against her: the Written Warning, the suspension, the Coaching Memorandum, and the Performance Evaluation. Charge at 1. She wrote that "[w]hile she was out on sick leave, and despite having proper medical documentation in place, Leroy Jones, Vice President of Bus Transportation, emailed [her] and advised her that she was terminated." Charge at 1. Accordingly, Muse charged WMATA "with unlawful discriminatory acts in violation of Title VII of the Civil Rights Act of 1964." Charge at 1.

The EEOC later issued Muse a Determination and Notice of Rights, declining to pursue the matter and informing her of her right to sue. Amend. Compl, ECF No. 10, ¶ 17–18. And so she did, filing a complaint under Title VII of the Civil Rights Act against WMATA. Compl., ECF No. 1. She amended that complaint a few months later. Amend. Compl. WMATA answered, and the parties completed discovery. Answer, ECF No. 11; Minute Entry 03/22/2024.

WMATA now moves for summary judgment. Mot. Summ. J., ECF No. 17. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as this suit arises under Title VII. The motion is ripe for decision.

## II.

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The motion is properly granted "when, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in her favor." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). More, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013).  So the Court's role "is not to determine the truth of the matter, but instead to decide only whether there is a genuine issue for trial." *Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 14 (D.D.C. 2014) (cleaned up).

**III.**

Muse brings five counts under Title VII against WMATA: discrimination on the basis of sex; discrimination on the basis of retaliation; wrongful termination on the basis of sex; wrongful termination on the basis of retaliation; and a hostile work environment on the bases of sex and retaliation.[1]  Consider each claim in turn.

**A.**

Title VII of the Civil Rights Act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e–2(a)(1).  This text sets out two elements for a sex discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of her sex.  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

Muse suffered a handful of adverse employment actions here.  The parties agree on some: She was chastised in the Written Warning; suspended for five days; rated poorly in the

---

[1] Count Two of the Amended Complaint also purports to allege a hostile work environment in violation of the Rehabilitation Act of 1973.  Amend. Compl. at 8.  But because Muse has not asserted that she suffers a disability, WMATA is entitled to summary judgment on this claim so far as it exists.  *See Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014).

Performance Review[2]; and ultimately terminated.  These actions certainly left Muse "worse off" and caused "some injury respecting [her] employment terms or conditions."  *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024).

But the parties disagree on whether other allegations qualify.  WMATA insists that certain contentions are "outside the scope" of Muse's Title VII suit because she failed to raise them before the EEOC.  Def.'s Mot. Summ. J. at 4.  A Title VII suit is limited in breadth to claims that are "like or reasonably related to" the allegations in the original EEOC charge.  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.D.C. 1995).  This standard "serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employee some warning of the conduct about which the employee is aggrieved."  *Cheek v. W. & S. Life Ins.*, 31 F.3d 497, 500 (7th Cir. 1994).  So while a Title VII suit is not strictly circumscribed by "the four corners of the prior administrative charge," it is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Torriero v. Olin Corp.*, 684 F. Supp. 1165, 1170 (S.D.N.Y. 1988).

More, even if certain allegations are "related" to those in the EEOC charge, they cannot be considered in a subsequent Title VII suit if the plaintiff could have presented them to the EEOC but neglected to do so.  *Foxworth v. McDonough*, 712 F. Supp. 3d 1, 8–9 (D.D.C. 2024).  To hold otherwise would permit plaintiffs to "circumvent the exhaustion requirement" and "undermine the agency's ability to investigate and administratively resolve discrimination claims."  *Id.* at 8.  In short, a Title VII suit can encompass the allegations made in the EEOC

---

[2] The parties bicker over whether the Coaching Memorandum constitutes an adverse employment action.  But the Court need not decide that question.  The Coaching Memorandum was referred to in the Performance Review and subsumed therein.  Performance Review at 3.

charge and any post-charge grievances that are reasonably related thereto.  But it cannot expand beyond that, lest the purpose of the agency be undermined.

Now consider Muse's allegations.  For the most part, the Court agrees with WMATA about which allegations were properly exhausted.  Muse tries to bring in allegations of adverse employment actions that should have been included in her EEOC charge.  For instance, she claims that she was deprived of a company vehicle and denied the opportunity to discipline a subordinate while stationed at her previous division.  Pl.'s Opp'n Br. at 4.  She also insists she was excluded from a pertinent email, making her look incompetent.  Pl.'s Opp'n Br. at 11.  But none of these accusations were included on the EEOC charge.  *See* Charge of Discrimination, ECF 17-2.  And because she made that charge after she was terminated, all the accusations predate the administrative complaint.  So she is not authorized to belatedly raise them now, thereby avoiding adjudication by the EEOC.  *Accord Foxworth*, 712 F. Supp. 3d at 8–9.

But the Court disagrees with WMATA on one charge.  Muse contends she suffered an adverse employment action when she was deliberately understaffed because of her sex.  WMATA wisely does not argue that understaffing is not "some harm respecting an identifiable term or condition of employment."  *Muldrow*, 601 U.S. at 354.  That argument would not be a winner—the intentional deprivation of the tools one needs to carry out her duties may constitute a "disadvantageous" circumstance.  *Id.*  Instead, WMATA insists that the understaffing claim is "outside the scope" of Muse's Title VII suit.

The Court reads the administrative complaint differently.  Muse specified that she had contacted the Employees Relations Department to complain "that Mr. Sanders was denying her the tools, help and assistance that she needed to perform her duties and run the largest division in Bus Transportation," although "he provided assistance to the male Superintendents."  Charge of

Discrimination at 1.   This allegation was enough to prompt the EEOC to look into understaffing concerns, as well as to put WMATA on notice that Muse had problems with the sufficiency of her resources.  *See Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998).  Thus the allegations of unfair staff constraints are properly considered here.  *See also Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.*, 595 F.2d 711, 727 (D.C. Cir. 1978) ("[C]omplaints to the Commission are to be construed liberally since very commonly they are framed by persons unschooled in technical pleading.").

Finding various adverse employment actions within the scope of the suit, the Court must decide whether there is a genuine dispute that these actions were taken because of Muse's sex. To do so, the Court proceeds as follows.  First, it considers the single allegation of discrimination for which WMATA has failed to offer a legitimate justification—that Muse was short-staffed compared to similarly situated males.  Second, it turns to the various allegations for which WMATA has proffered nondiscriminatory explanations.

**1.**

Take first Muse's allegations that she was deprived of the ability to pick her own staff and was thus short-staffed because of her sex.

WMATA has not provided a nondiscriminatory justification for this action.  *See* Def.'s Mot. Summ. J. at 6 n.1.  So the Court asks whether Muse has made out a prima facie case of sex discrimination.  *See Brady*, 520 F.3d at 494 n.2; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of discrimination, a claimant must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d

151, 155 (D.C. Cir. 2007).  The first two elements are met.  *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97 (D.D.C. 2007).  So the Court considers the third.

Does the alleged failure to adequately staff Muse give rise to an inference of discrimination?  Muse testifies that Sanders did not allow her to select her own subordinates but allowed male superintendents to do so.  Muse Depo. 53:19–54:1 ("Mr. Sanders treated the females differently than he treated the males . . . As superintendents, Mr. Thompson and Mr. Sheppard were able to pick who they wanted to go with them at their divisions.  I was not afforded that opportunity to pick my staff.").  And she alleges that her division was brought up to full staff within a week of a male superintendent taking over after her termination.  Muse Depo. 54:2–7 ("I only had three employees to run the largest garage.  And the week after I got terminated, Mr. Sheppard came there—and I had been asking for help—Mr. Sheppard came to Montgomery, and he was fully staffed."); 164:4–8.

The Court concludes that Muse has failed to meet her prima facie burden.  Sure, a plaintiff can expound an inference of discrimination by "demonstrating that she was treated differently from similarly situated employees who are not part of the protected class."  *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).  But to put forth valid comparison evidence for a sex discrimination claim, Muse must show that "all of the relevant aspects of her employment situation were nearly identical to those of the male employee."  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (cleaned up).  Muse has not attempted to show how she was virtually indistinguishable from Shepperd and Thompson.  And in fact, the record reveals the opposite. *See Brathwaite v. Vance Fed. Sec. Servs., Inc.*, 613 F. Supp. 2d 38, 49 (D.D.C. 2009) ("If no reasonable juror could conclude that two employees were similarly situated, then a court may find they were not similarly situated as a matter of law.").

For one, Muse was asking for something distinct from what Shepperd and Thompson were afforded. The men were permitted to bring staff with them from previous posts. Muse Depo. 58:2–18. Muse was denied the opportunity for a staff member to stay at Muse's new unit because the staff member had been promoted and moved elsewhere. Muse Depo. 59:8–15. So Muse was not in the same posture as Shepperd and Thompson—she was making a bigger and different request. *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 97 (D.D.C. 2005), *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007) ("To be similarly situated, plaintiff must establish that [her] employment situation was similar in all relevant regards to those with whom [s]he seeks comparison.").

More, Muse has a distinct disciplinary record that she fails to address. She has a documented history of staff complaining about her leadership. Written Warning at 3. She failed to complete various training courses that were required for someone of her rank. Performance Eval. at 3. And it was often apparent that Muse neglected to adequately prepare her subordinates to operate in her frequent and unplanned absences. Performance Eval. at 3. These supervisory oversights culminated in a botched sexual harassment investigation where Muse violated company policy and failed to report discriminatory behavior by her staff. Investigation at 1–6. Muse does not present evidence that Shepperd or Thompson had similar management flaws. So it would not be reasonable to conclude that the three are similarly situated such that any disparate treatment raises an inference of discrimination. *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1175 (D.C. Cir. 2021) (holding cited comparators were inapposite "because they did not have similar disciplinary histories to [plaintiff]"); *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (stating plaintiff "provided no evidence that these individuals had individual performance problems or had performance problems similar to hers") (cleaned up).

Without valid comparators, Muse has no other proof for the conclusion that her lack of staff was linked to her sex.

In sum, Muse has failed to present evidence that would allow a reasonable juror to infer that her resource constraints were due to her sex. So WMATA is entitled to summary judgment on this claim. *Accord Breiterman*, 15 F.4th at 1176.

**2.**

Move now to the adverse employment actions for which WMATA offers nondiscriminatory justifications. WMATA vehemently denies that Muse's gender ever entered the picture for these acts. It argues that "Sanders issued the Written Warning Memo to highlight Plaintiff's obvious performance issues, including her lack of urgency investigating a major bus accident in her division and the overall poor management of her bus division." Def.'s Mot. Summ. J. at 9. It insists that "Sanders suspended Plaintiff for five days . . . for her continued poor job performance, including failing to ensure that bus operators under her management were properly compliant with WMATA's then-existing COVID-19 procedures." *Id.* As for the Coaching Memorandum, WMATA alleges that it was issued "as a reminder of the proper procedure for terminating bus operators after an incident involving a bus operator who was prematurely terminated as discipline by Plaintiff." *Id.* And the Performance Review was purportedly "justified by Plaintiff's continued poor job performance." *Id.*

Where, as here, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," the Court must answer one key question: Whether the employee has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . .

sex." *Brady*, 520 F.3d at 494.  In short, the Court must ask whether any rational jury would agree that employer's proffered justifications were pretextual.  If not, and the plaintiff's theory of discrimination is too far-fetched, summary judgment goes to the employer.

An employee like Muse has a few ways to show her employer is prevaricating.  She can produce evidence that her employer treated men more favorably under the same conditions.  *See* 1 Lex K. Larson, *Employment Discrimination* § 8.04, at 8–66 (2d ed. 2007) ("Probably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment.").  Or she can show that her employer is fudging the facts that allegedly support the employment decision.  *Brady*, 520 F.3d at 495.  She could also point to any slurs or offensive language by the decisionmaker; the employer's collective treatment of women; the employer's diversion from internal procedures; or any fluctuation in the asserted reasons for the employment action.  *See* 1 Larson § 8.04, at 8–75; 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 89 (4th ed. 2007); 1 Abigail Cooley Modjeska, *Employment Discrimination Law* § 1.9, at 1–139 (3d ed. 2007).

Muse's proffered evidence of pretext can be thought of in two categories.  First, that Sanders treated men more favorably than women.  And second, that Sanders treated women generally disrespectfully.  On careful review, the Court finds that the cited evidence is little more than a paper tiger.  Muse's comparators are superficial and taken out of context.  And she misrepresents the record repeatedly.  No reasonable jury could conclude that she had successfully rebutted WMATA's stated justifications.

Take first her allegations that certain male employees were treated better.  She insists that the "[Written] Warning . . . unreasonably admonished [her] for being out of town while off duty

when an unexpected accident happened on September 19." Pl.'s Opp. Mem. at 17. But she

argues that "Sanders did not discipline or admonish a similarly situated male Superintendent, Mr.

Shepperd, for failing to thoroughly investigate an accident even though he was on duty." *Id.*

(citing Bell Depo. 32:2–3).

Muse oversimplifies the Written Warning to simulate a similarly situated male. The

Written Warning went well beyond Muse's failure to appear on the scene of the accident. It

thoroughly documented her failure to investigate the accident after she had returned to work.

Written Warning at 2. It detailed the discrepancies in the data she produced for the investigation.

*Id.* And it discussed how she took unscheduled vacation leave amid the investigation and failed

to properly brief her staff before she left. *Id.* Besides Muse's accident-related failures, the

Written Warning also discussed her lack of diligence in preparing an important spreadsheet for

Vice President Jones. *Id.* at 1. More, it documented her history of taking leave without

following company policy beforehand. *Id.* at 3. And it highlighted various concerns about

Muse's leadership that came from her subordinates. *Id.* at 3–4. In short, to allege that Shepperd

is "similarly situated" ignores a score of salient factors that make Muse very different indeed.

One cannot equate freckles and chicken pox just because they both consist of spots. *Accord*

*Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015) (holding a court may grant

summary judgment if it finds no reasonable juror could determine two comparator employees are

actually similarly situated).

Muse offers another reason why the Written Warning was discriminatory: She failed to

timely submit her spreadsheet because she was understaffed. Pl.'s Opp'n Mem. at 17. And she

was understaffed because "Sanders allowed male Superintendents . . . to pick their own staff, but

did not permit Plaintiff the same privilege." *Id.*; Muse Depo. 53:18–54:1. But a claim about

why she was unable to complete her tasks does not erase the fact that she failed to complete

them.  And the Court has already found that Muse failed to link her alleged understaffing to her

sex.  So this claim does not cast WMATA's reasons for the Written Warning in a pretextual

light.  Instead, it reinforces one of them:  Muse was not finishing her work on time.  Plus, it bears

repeating that the late spreadsheet was just one of several reasons Muse was issued the Written

Warning.  Understaffing cannot explain spontaneous and sporadic absences taken despite

company policy; neither can it alleviate the concerns her staff had with her leadership and

communication skills.  Muse may not blur out important context by hyper-focusing her

microscope.

Similarly, Muse insists that the suspension was discriminatory because a male

superintendent with the same supervisor as Muse, Keith Sanders, sent an employee home to get

his vaccination card yet was not disciplined.  Pl.'s Mem. Opp. at 10; Muse Depo. 160:14–

161:10.  But her comparison misses the mark.  The record makes abundantly clear that Muse was

not suspended for sending an employee home.  Instead, she was disciplined after giving an

employee unauthorized vacation time, dissembling about that fact, and then permitting him to

work despite his failure to upload his vaccination card.   Ltr. of Suspension *passim*.  So again,

Muse and her cited counterpart present too many disparities to be valid comparators.

Muse mounts a similar line of attack to her termination.  She insists she "was on

approved FMLA [leave]" when she was terminated, and that "[i]t is undisputed that Plaintiff was

in compliance with WMATA policies and provided all documentation necessary for her

approved FMLA leave."  Pl.'s Opp'n at 28.  This is true.  FMLA Email Exchange, ECF No. 17-

6.  It is also irrelevant.  Muse's termination had little if anything to do with her sick leave.  The

record is unmistakably clear that she was let go after a series of performance shortcomings, and,

most proximately, a botched sexual harassment investigation.  Discharge Review at 2 ("Muse is not capable of managing others, repeatedly fails to enforce policies, nor is she willing to perform her job as a manager with integrity.").  So Muse's attempted comparator evidence—that a "similarly situated employee, Mr. Coombs" was "permitted to take FMLA and return as he desired"—falls flat.  Pl's Opp'n Br. at 29.  Muse and Coombs were not relevantly similar in all respects.

The second category of evidence that Muse presents focuses on Sanders's treatment of women more broadly.  An "employer's general treatment of minority employees" is a legitimate way for an employee "to cast doubt on an employer's asserted reason[s]" for adverse employment actions.  *Brady*, 520 F.3d at 494 n.2.  But again, Muse's purported proof misses the mark.

She first contends that "when a female Superintendent cursed at another employee, Director Sanders immediately reported [her]."  Pl.'s Mem. Opp'n at 18.  But "Director Sanders refused to take disciplinary action against a male Superintendent who cursed and screamed at a female employee, despite the female employee crying and being under distress."  *Id.*  Muse's attempt to set up a damning dichotomy fails.  The evidence does not match up with her allegations.  The "female Superintendent" she refers to is Sara Cabrera, an employee with WMATA's labor department.  Muse Depo. 68:2–12.  Cabrera had a conflict with another employee, Simeone Snowden.  Muse Depo 68:2–9.  When Sanders and Vice President Jones caught wind of it, they "basically flipped it on Ms. Snowden."  Muse Depo. 68:5–8.  Employee Relations ultimately suspended Snowden.  Muse Depo. 68:7–9.  Cabrera was not disciplined.  Muse Depo. 68:8–9.

Compare that to the incident with the purported "male Superintendent."  Pl.'s Mem.
Opp'n at 18.  In her deposition, Muse testifies that Tejmun Dandridge, a male *operator*—not
supervisor—"curs[ed] out" a Delores Procter.  Muse Depo. 64:1–7.  Procter was "an executive in
Executive Leadership."  Muse Depo. 64:4.  Muse recounts that Sanders witnessed the
confrontation, called Dandridge into his office, and "shut the door and spoke with him," but "no
discipline was ever taken."  Muse Depo. 64:11–12.  Procter was distressed and "crying," but
Sanders did not discipline Dandridge.  Muse Depo. 66:10.

Putting aside the discrepancies between Muse's briefing and sworn testimony, the two
incidents are so distinct as to make drawing an inference of discrimination from them dubious.
For one, the record makes clear that Sanders did not report Cabrera, the female superintendent.
Nor could he, considering she was not in his chain of command.  Muse Depo. 68:16–18.  And
while a female employee was ultimately suspended because of the quarrel, it was not Sanders
who made that call; it was Employee Relations.

The situation with Dandridge was different.  Dandridge had grown irate with one of
Sanders' superiors.  Muse Depo. 66:15–17.  Sanders had a talk with Dandridge but did not take
any disciplinary action.  Muse. Depo. 64:11–16.  One can see why the two situations are not
comparable.  On the one hand, there is a female superintendent outside of Sanders's department
who sparred with a female subordinate.  On the other hand, there is a male subordinate within
Sanders's department who criticized Sanders's female superior.  There are a few too many
confounding variables here to draw any salient conclusions.  *See Cung Hnin v. TOA*, 751 F.3d
499, 505 (7th Cir. 2014).  In science and in law, causal deductions are misplaced absent firm
controls.

Next up in Sanders' alleged record of sex discrimination is the story of Anne Marie Castrovinci. Pl.'s Mem. Opp'n at 18. Muse posits that Castrovinci "reported that Director Sanders was treating her differently because she was a woman." *Id.* The record reflects otherwise. Castrovinci reported Sanders for *race* discrimination, not sex discrimination. Determination Ltr. at 1 ("You alleged that Keith Sanders . . . discriminated against you based on your race (White)."). This incident does not bolster Muse's assertion that Sanders treated *women* differently compared to men. It is only probative of an allegation that Sanders treated white employees unfavorably relative to black employees. It is not enough that Muse may perceive the Castrovinci incident as sex discrimination; "[i]t is the perception of the decisionmaker which is relevant," not the plaintiff's "subjective assessment." *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002).

Finally, Muse repeatedly emphasizes how Sanders called her by her first name, while he would refer to other male superintendents by their titles and surnames. Pl.'s Opp'n at 6. But this discrete example is not enough for a reasonable jury to conclude that Muse has revealed WMATA's extensive and corroborated justifications as mere pretext. Muse cannot establish a genuine issue of material fact with stray comments that were attenuated from her reprimands and termination. *See Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 44 (D.D.C. 2014) (holding epithets were "insufficient proof of discrimination" as there was "no nexus between the stray remark[s] and the adverse employment decision.") (cleaned up). Indeed, "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decisions." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *cf. Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 358 (3d Cir. 1999) (holding evidence that a supervisor "made remarks that women were unreliable employees because they get pregnant and because they get breast

cancer" could not establish a "generally discriminatory attitude [] that may have led to [plaintiff's] discharge" when the remarks "were not made in the context of any employment decisions").

More, Muse never requested that Sanders call her by her last name.  Muse Depo. 55:22–56:2.  And she did not object to him calling her by her first.  Muse Depo. 57:9–10.  So it is unclear whether any latent discriminatory feelings motivated the practice.  Plus, pretext has been found absent where employees were called names much worse than their own—and where the notion of implied consent would be foolhardy—especially where the countervailing justifications for termination were irrefutable.  *See Sreeram v. Louisiana State Univ. Med. Ctr.-Shreveport*, 188 F.3d 314, 320 (5th Cir. 1999) (no evidence of pretext for female doctor's termination even where overtly sexist comments were made by supervisors where "[t]he record clearly demonstrate[d] that everyone who reviewed [the plaintiff's] performance determined that it was not commensurate with what is expected of a third-year surgical resident.").  Sanders' conduct may not have sat right with Muse.  But it cannot create a perception of a generally discriminatory culture.  And it lacks any demonstrable link to an adverse employment action Muse suffered.  Most importantly, no reasonable jury could find that it was so overwhelming as to rebut WMATA's various justifications.

In short, Muse has failed to muster evidence for a reasonable juror to conclude that she was penalized because of her sex.  So WMATA is entitled to summary judgment on Muse's sex discrimination claim.

**B.**

Turning now to Muse's retaliation claims.  Title VII prohibits an employer from retaliating against an employee because she has made a charge of discrimination.  42 U.S.C.

§ 2000e-3(a).  To make out a prima facie case of retaliation, an employee must establish three elements: (1) that she engaged in protected conduct; (2) that she faced an adverse employment action; and (3) the adverse action was taken because of plaintiff's protected conduct.  *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012).  If the plaintiff successfully establishes her prima facie case, the burden shifts to the employer to present a legitimate, non-retaliatory justification for the adverse treatment.  *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015).

Like the disparate treatment claim above, the burden-shifting framework largely falls away "[o]nce the employer proffers a non-retaliatory reason for the challenged employment action."  *Allen*, 795 F.3d at 39.  The key question for the Court becomes "whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee."  *Id.* (cleaned up).  Whether the plaintiff has made out her prima facie case remains a relevant factor, but only if it bears on that ultimate inquiry.  *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289, 1291 (D.C. Cir. 1998).

Muse posits that she engaged in protected activity when she "contacted the WMATA Employee Relations Department lodging a complaint against Service Director Keith Sanders, and identifying his discriminatory and unfair treatment of her."  Amend. Compl. ¶ 73.  Since then, she alleges she has "suffered harassment at the hands of WMATA management officials as a result of her protected EEO activities."  *Id.* ¶ 75.  She points to the Written Warning, the suspension, the Coaching Memorandum, the Performance Evaluation, and her termination as evidence of retaliation.  *Id.* ¶¶ 79–83.  WMATA recites the same justifications for the adverse employment actions to insist they were not tit-for-tat.  Def.'s Mot. Summ. J. at 15 ("[A]s explained [] in the discussion concerning Plaintiff's discrimination allegations . . . WMATA

26

ha[s] articulated non-retaliatory reasons for its actions, which boil[] down to Plaintiff's clearly demonstrated poor job performance and the need for Plaintiff to correct it.").

First, Muse has not presented sufficient evidence for a reasonable jury to find that she engaged in protected activity. Her amended complaint alleges only one instance of protected activity: contacting Employee Relations on November 1, 2021. Amend. Compl. ¶ 73. But Muse abandons the argument that the November 1 grievance was protected activity in her opposition to WMATA's motion for summary judgment. *See* Pl.'s Mem. Opp'n at 25–26. Likely for good reason: the contemporaneous record suggests that she did not charge Sanders with sex discrimination in the November 1 complaint. *See* Ex. 3 (referring Muse to Employee Relations because she revealed it was "not [her] perception" that "the negative treatment" by Sanders "was because of or motivated by any protected category.").

"[N]ot every complaint entitles its author to protection from retaliation under Title VII." *Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 247 (D.D.C. 2011), *aff'd*, 573 F. App'x 1 (D.C. Cir. 2014). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination" on the basis of a protected characteristic. *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). So Muse cannot invoke the protections of Title VII for actions allegedly in retaliation to the November 1 grievance.

Muse gets creative in her opposition briefing by expanding her cited examples of protected activity. At this stage, she claims that she engaged in protected activity when she complained to Coyne in management that Sanders was discriminating against her on the basis of sex. Pl.'s Opp'n Br. at 25 (citing Muse Depo., 73:22–74:5). And she alleges that her conversation with Carla Elliot in WMATA's OEEO constituted protected conduct. *Id.* (citing Muse Depo. 52:4–2, 88:6–15).

Muse's attempts to widen the net fail. First, the record makes clear that Muse did not raise allegations of sex discrimination before Elliot. Ex. 3 (noting Muse did not report Sanders for disparate treatment on the basis of a protected characteristic); Muse Depo. 88:8–11 ("Did you tell Carla Elliot that you believe Keith Sanders was treating you differently because you were a woman?" "No."). So Muse has not shown that she made a complaint of discrimination based on membership in a protected class to Elliot at least. *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 89 (D.D.C. 2010).

More significantly, new claims cannot be pled in summary judgment briefs. *See Harris v. Trustees of Uni. of D.C.*, 567 F. Supp. 3d 131, 154 (D.D.C. 2021); *see also Sai v. Transp. Sec. Admin.*, 326 F.R.D. 31, 33 (D.D.C. 2018) (holding plaintiff could not assert a new disability on summary judgment to support his Rehabilitation Act claim; "[a]dding an allegation" of a new disability "would not constitute a simple clarification of the existing complaint" but "would add a new claim not encompassed by [the plaintiff's] prior pleading."). To permit late allegations would usurp the opposing party's opportunity to fairly defend the complaint as well as circumvent the requirements of Federal Rule of Civil Procedure 15. Because Muse did not raise the alternative examples of protected activity in her amended complaint, they are not properly before the Court now.

And even if Muse *did* engage in protected activity, her retaliation claims would still flop. Her evidence of pretext rests wholly on temporal proximity. Pl's Mem. Opp'n at 28 ("[T]he proximity in which each disciplinary action against Plaintiff occurred and her protected activity establishes a causal link between the two."). And true, the timeline is narrow—the Written Warning was issued not even two weeks after Muse's complaints to Elliot and Employee Relations. *See* Written Warning at 1 (dated November 10, 2021). This does support Muse's

case; when protected conduct and adverse actions are "very close in time," "temporal proximity can indeed support an inference of causation." *Hamilton*, 666 F.3d at 1357.

But a tight chronology is not enough for a reasonable jury to conclude that the adverse employment actions were retaliatory. "If temporal proximity sufficed to rebut a legitimate proffer [of non-retaliatory justifications], then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) (holding "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine"). The Court cannot sanction threadbare accusations, as they diminish the virility of specific ones. With only naked adjacency, Muse has failed to adduce a plausible rebuttal for WMATA's asserted justifications. So WMATA is entitled to summary judgment on her retaliation claims.

## C.

The Court considers last Muse's hostile work environment allegations. These contentions are more of the same. She posits that she was "harassed, embarrassed, and made to endure a great amount of pain and suffering" because of the Written Warning, the suspension, the Coaching Memorandum, and Performance Review, and the termination. Amend. Compl. ¶¶ 64–70. She claims that these conditions stemmed from sex discrimination and retaliation. *Id.* at 8.

Title VII prohibits an employer from subjecting its employees to discriminatory, hostile, or abusive work environments. *Arnoldi v. Bd. of Trustees, Nat'l Gallery of Art*, 557 F. Supp. 3d 105, 120 (D.D.C. 2021), *aff'd*, 2022 WL 625721 (D.C. Cir. Mar. 1, 2022) (per curiam). But general snarkiness and one-off squabbles do not suffice. The workplace must be "permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systs., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).  Courts look to the "frequency and severity of the conduct"; whether it was "physically threatening or humiliating as opposed to merely offensive"; and whether it "unreasonably interfere[d] with the employee's work performance."  *Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 23 (D.D.C. 2014) (citing *Harris*, 510 U.S. at 23).  The alleged harassment "must be both objectively and subjectively hostile or abusive" to be actionable.  *Id.*  And without "some linkage between the hostile behavior and the plaintiff's membership in a protected class," or the plaintiff's protected conduct, the claim must fail, "no matter how unjustified or egregious" the defendant's behavior.  *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009).

Muse's hostile work environment allegations mirror her sex discrimination and retaliation claims almost exactly.  *See generally* Amend. Compl.  This will not do.  The causes of actions were crafted to address distinct harms.  Disparate treatment and retaliation claims center on isolated manifestations of bias.  But hostile work environment complaints charge an employer with creating a workplace so infected with "intimidation, ridicule, and insult" that the employer is effectively engaging in a pattern of abuse.  *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999).  And hostile work environment claims based on actions by supervisors are especially questionable.  *See Arnoldi*, 557 F. Supp. 3d at 121.  The paradigmatic hostile work environment claim involves such severe and pervasive mistreatment by co-workers that a supervisor's failure to stop it is implicit condoning of the harm.

In short, plaintiffs "should not be permitted to 'bootstrap' [their] alleged discrete acts of discrimination and retaliation into a broader hostile work environment claim."  *Rattigan v.*

*Gonzales*, 503 F. Supp. 2d 56, 81 (D.D.C. 2007).  To allow such amalgamation "would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address." *Id.* at 82.  Yet Muse does just that, stirring up discrete adverse actions to allege they constituted one unlawful stew.  But "cobbling together a number of distinct, disparate acts will not create a hostile work environment." *Id.*  And a "plaintiff cannot cure [her] failure to timely exhaust [her] complaints about [certain] incidents by sweeping them under the rubric of a hostile work environment claim." *Patterson v. Johnson*, 391 F. Supp. 2d 140, 146 (D.D.C. 2005), *aff'd*, 505 F.3d 1296 (D.C. Cir. 2007).

It is easy to see why.  The allegations are ill-suited for this cause of action.  Merely being subject to a series of performance admonitions does not render one's office "abusive." *Harris*, 510 U.S. at 2; *Hussain v. Nicholson*, 435 F.3d 359, 366–67 (D.C. Cir. 2006) (affirming summary judgment for defendant because no reasonable jury could find a hostile work environment based on a denial of promotion, denial of medical leave, poor performance evaluations, and threats of termination).  Sensing as much, Muse expands her evidence in her opposition briefing.  She insists various other incidents turned the workplace intolerable: Sanders confiscated Muse's company car, but no one else's; Sanders called Muse by her first name but called her male counterparts by their title and surnames; Muse was understaffed compared to her male coworkers; and Sanders treated women in general more unfavorably than men.  Pl.'s Opp'n Br. at 21–22.  For the reasons already discussed, these claims are not properly before the Court. *Winder v. D.C.*, 555 F. Supp. 2d 103, 108 (D.D.C. 2008), *aff'd sub nom. Winder v. Erste*, 566 F.3d 209 (D.C. Cir. 2009) (rejecting plaintiff's attempts to expand breach of contract claim to encompass unpled, earlier contracts at summary judgment stage).

More, Muse's cited slights fail to muster a triable issue of fact.  At best, they resemble "a series of petty insults" and "legitimate . . . constructive criticism offered in [] letters of counseling and remand" that are not actionable under Title VII.  *Brooks v. Grundmann*, 748 F.3d 1273, 1278 (D.C. Cir. 2014); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  No reasonable jury could label these incidents as objectively "extreme."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The allegations are "simply too common a workplace grievance to support a hostile work environment claim."  *Rattigan*, 503 F. Supp. 2d at 81 (holding denial of resources, exclusion from communications and meetings, isolated discriminatory comments, and a demotion did not support a hostile work environment claim). Thus WMATA is entitled to summary judgment on this claim, too.

## IV.

For those reasons, WMATA's motion for summary judgment will be granted.  A separate order will issue today.


Dated: November 14, 2024                 _____

                                         TREVOR N. McFADDEN, U.S.D.J.